Adam D. Brumm, Esq.  SB #257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BFS GROUP OF CALIFORNIA LLC, a California corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 and 1365, *et seq*.

## I.    INTRODUCTION

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant BFS GROUP OF CALIFORNIA LLC ("Defendant") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

COMPLAINT – Page 1

**Notice Letter**

2.      On or about January 26, 2026, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendant, including a copy delivered to Defendant by certified mail, to Facility Manager, Builders First Source (BFS), 1351 East Beamer Street, Woodland, California ("Defendant's facility" or "the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendant**

8.      Defendant BFS GROUP OF CALIFORNIA LLC, doing business as Builders First Source (BFS), located at 1351 East Beamer Street, in Woodland, California, is a California corporation in good standing with the California Secretary of State.

### III. JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

10. Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV. ARTICLE III STANDING

11. Plaintiff is an environmental membership organization with active voluntary associational members who reside in northern California, as confirmed by documents on file with the California Secretary of State.

12. Plaintiff has multiple identifiable associational members in northern California, as confirmed by public records.

13. Plaintiff's organizational purpose and mission is the protection, preservation and enhancement of the navigable rivers, lakes and oceans (and their tributaries) physically located in northern California.

14. Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the CWA and California's Industrial General Permit, by seeking redress against industrial businesses located in northern California who violate the CWA and fail to comply with all standard conditions of California's Industrial General NPDES Permit ("General Permit").

15. The filing of this complaint is germane to Plaintiff's organizational purpose and mission.

16.     Violations of the standard conditions of the General Permit are actionable by citizens under the CWA pursuant to 33 U.S.C. section 1365(f)(7).

17.     A subset of EDEN's current and identifiable associational members reside, work and/or recreate near Cache Creek, a permanent, continuously flowing body of water which has an adjacent surface connection to the Sacramento River, a navigable Water of the United States which is part of the Sacramento-San Joaquin River Delta ("the affected waterways"), and use those waters and their watersheds for kayaking, canoeing, boating, paddleboarding, cycling, recreation, fishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of the affected waterways has been and continues to be adversely impaired by Defendant's failure to comply with standard conditions of the Industrial General Permit.

18.     A subset of EDEN's current and identifiable associational members described above are all persons for whom the aesthetic and recreational value of the affected waterways has been diminished and/or impaired on an ongoing and continuous basis as a direct result of Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

19.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who are aware of Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

20.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who believe that Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, have directly contributed to (a) degradation of the affected waterways downstream from the Facility; (b) injury to, deformation and toxicity of the aquatic life in the affected waterways; and (c) a reduction in the number of birds and other wildlife existing in the area.

21.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who intend to return to the affected waterways to recreate, albeit with a diminished desire and aesthetic enjoyment, directly attributable to

Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

22.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to immerse any part of their body in the portion of the affected waterways downstream from Defendant's facility because of their awareness of Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility as described herein, their belief that Defendant's ongoing violations proximately caused or contributed to degradation of water quality in the affected waterways since at least January 27, 2021, and continuing to the present, and concerns over potential adverse health effects caused by bodily contact with the affected waterways.

23.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to consume any fish caught from the affected waterways because of their awareness of Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, their belief that Defendant's ongoing violations proximately caused or contributed to degradation of the affected waterways since at least January 27, 2021, and continuing to the present, and concerns over potential adverse health effects of consuming fish caught from the affected waterways.

24.    A subset of Plaintiff's current and identifiable associational members described in the paragraphs above are all persons who have experienced informational injuries directly resulting from Defendant's ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, since at least January 27, 2021, and continuing to the present, as described herein.

25.    The informational injuries sustained by Plaintiff's current and identifiable associational members as described in the paragraphs above constitute a deprivation of the rights of the referenced persons to obtain complete and accurate information regarding Defendant's compliance with standard conditions of the General Permit at the Facility, which provisions have

been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

26.     One of the most important standard conditions of the General Permit is monitoring and reporting, which is comprised of multiple separate requirements.

27.     The first step requires industrial businesses covered by the General Permit ("Permittees") identify in their Storm Water Pollution Prevention Plan ("SWPPP") all industrial materials and chemicals present at their facility.  For each industrial material/chemical identified, the Permittee is required to designate an indicator parameter as an additional sampling parameter if the material in question has any potential to commingle with storm water.  This ensures that Permittees are testing their storm water for all potential constituents likely to be present in their storm water runoff.

28.     The next step is to designate locations for collecting storm water samples which are representative of industrial activity.  This means that a Permittee must collect storm water samples from areas of their facility that are likely to show the presence of industrial materials and chemicals from outdoor industrial activities conducted by the Permittee.

29.     The General Permit requires Permittees to segregate their facility into separate drainage areas, defined by the direction of storm water flowing to a common area.  Storm water encompasses both surface flow (above ground) and precipitation falling on the facility that enters drain inlets and flows through underground conveyances.  Drainage areas are also dependent on the layout of facility in terms of the location of buildings, structures, ground elevations, grading and storm water conveyances.

30.     The Permittee is then required to designate at least one representative storm water sampling location for each of the segregated drainage areas.

31.     Defendant's facility handles numerous types of chemicals and industrial materials which are associated with the following toxic substances:  Ammonia, Iron, Volatile Organic Compounds (VOCs) and Zinc.

32.     As described in this complaint and the attached Notice, to date Defendant has not yet conducted an adequate sampling parameter assessment for the Facility and has not segregated the Facility into separate drainage areas and depicted those drainage areas on the Facility's Site Map.

33.     Since January 27, 2021, and continuing to the present, Defendant has not collected storm water from all required areas of the Facility and has not tested the Facility's storm water for all required sampling parameters.

34.     In addition, Defendant's housekeeping practices at the Facility are extremely deficient on an ongoing and continuous basis and include allowing toxic chemicals and industrial materials to enter onsite storm drains which flow into the affected waterways; failing to clean up spills of toxic industrial materials; maintaining uncovered waste bins; significant excess outdoor storage of scrap and industrial materials, and significant staining on the ground from industrial materials and chemicals, as well as other deficiencies which are detailed in the attached Notice.

35.     Another standard condition of the General Permit is that all Permittees must upload to the SMARTS publicly accessible database system all storm water sampling analytical data, SWPPPs and Site Maps, Annual Reports and other required documents.

36.     The purpose of this requirement is to allow the public to assist the regulatory agencies with monitoring Permittees' compliance with the standard conditions of the General Permit.

37.     The General Permit also requires Defendant's designated legally responsible person or duly authorized representative to certify under penalty of law that every document uploaded to SMARTS is true, correct and complete.

38.     Defendant's representatives have uploaded and certified documents to SMARTS which contain objectively false information, including Annual Reports which provide false explanations for Defendant's failure to collect storm water samples at the Facility; false and deficient SWPPPs which include objectively false information related to drainage, storm water flow, drain inlets, mandatory sampling locations, industrial materials handled at the Facility, and

storm water flow/sampling locations; and a Notice of Termination which contains false information and was filed for the improper purpose of terminating the Facility's prior Permit coverage.

39.     As a result of Defendant's intentional misrepresentations as articulated above, Defendant has since January 27, 2021, and continuing to the present, avoided its mandatory responsibility pursuant to the CWA and General Permit of testing the Facility's storm water for all industrial materials and chemicals handled there which could potentially come into contact with storm water, in violation of the standard conditions of the General Permit.

40.     As a result of Defendant's intentional misrepresentations as articulated above, Defendant has since January 27, 2021, and continuing to the present, avoided its mandatory responsibility pursuant to the CWA and General Permit of collecting storm water from all required sampling locations present at the Facility, in violation of the standard conditions of the General Permit.

41.     Defendant's failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's associational members referred to in the paragraphs above from: (a) accessing on SMARTS the true operational facts relevant to Defendant's facility; and (b) acquiring accurate and complete data related to the unmonitored substances emanating from Defendant's facility during rain events.

42.     As such, Plaintiff's current and identifiable associational members referred to in the paragraphs above are unable to fully assess the extent of the General Permit violations at the facility, as well as the types and levels of industrial materials entering the affected waterways, due to Defendant's willful violations of the standard conditions of the General Permit at the Facility; or to gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

43.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above have been members of EDEN since at least the date of Plaintiff's Notice to Defendant.

44. The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are individuals who have all experienced an ongoing, continuous, concrete, personal, specific, actual or imminent, non-speculative injury-in-fact commencing on and after January 27, 2021, and continuing to the present, arising directly from Defendant's failure to comply with the standard conditions of the General Permit at the Facility, as articulated herein.

45. The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who would have standing to file this suit by themselves as individual plaintiffs.

46. The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who will not be required to personally participate in this lawsuit, except for the member(s) who have agreed to be identified for purposes of standing. Plaintiff will disclose the identities of those member(s) to Defendant in Plaintiff's Initial Disclosures, pursuant to the requirements of Federal Rule of Civil Procedure 26.

47. The ongoing and continuous injuries sustained by the subset of EDEN's current and identifiable associational members described in the foregoing paragraphs will be adequately redressed by a judicial decision in this matter granting Plaintiff the injunctive relief requested herein.

## V. STATUTORY BACKGROUND

48. Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

49. Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Permittees or through the issuance of a

COMPLAINT – Page 9

single, statewide general permit applicable to all industrial storm water Permittees. 33 U.S.C. § 1342(p)

50.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

51.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of any standard condition of any NPDES Permit.

52.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

53.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

54.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation, for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

55.     Violations of the standard provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A.  **General Permit**

COMPLAINT – Page 10

56.    The California Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

57.    The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

58.    The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

59.    A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm water/igp_20140057dwq.html

60.    All industrial facilities located in California having the potential to discharge storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Permit Application, and an initial SWPPP and Site Map.

61.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

### 1.  **SMARTS Compliance Database**

62.    The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Permittees enter and manage storm water data associated with General Permit compliance.

63. SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Permittees' compliance with the General Permit and to pursue Permittees who fail to comply, utilizing the citizen's suit provision of the CWA.

64. SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

65. The General Permit requires Permittees to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Permit Applications, SWPPPs and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports. General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

## 2. Standard Conditions of the General Permit

66. The General Permit contains a variety of substantive and procedural standard conditions.

67. The General Permit requires that Permittees comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7). General Permit § XXI(A)

68. The primary standard conditions of the General Permit include the following:

(a) Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b) Implementing and maintaining *Best Management Practices* ("BMPs");

(c) Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d) Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all required sampling locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)    Establishing an onsite compliance Team of at least two employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

69.    All Permittees are required to develop and implement a SWPPP.

70.    The main objective of the SWPPP requirement is to identify and evaluate sources of industrial materials and chemicals associated with industrial activities that may affect the quality of storm water runoff from the Permittee's facility, and to implement BMPs to reduce or prevent materials associated with industrial activities in storm water runoff emanating from the Permittee's facility.  General Permit § X(C).

71.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days significant revisions must be made. General Permit § X(B)

72.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

73.    Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of an onsite compliance Team; a site

map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a discussion of whether industrial materials or chemicals have the potential to commingle with storm water;  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent industrial materials in storm water runoff. General Permit §§ X(A)-X(I)

74.     The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

75.     Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water from the facility, locations of storm water collection and conveyance systems, associated sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas. General Permit § X(E)

<u>Best Management Practices</u>

76.     The General Permit requires all Permittees to implement and maintain the following minimum Best Management Practices: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping.   General Permit § X(H)(1)

77.     The General Permit further requires Permittees to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs if necessary: exposure

minimization BMPs, storm water containment BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

78.    Failure to implement minimum and advanced BMPs as necessary is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

79.    The General Permit requires Permittees to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of industrial materials in a facility's storm water runoff to ensure compliance with the General Permit.

80.    As part of their monitoring program, Permittees must identify all required storm water sampling locations and evaluate the effectiveness of BMP .

81.    Section XI(B) of the General Permit requires that Permittees collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

82.    A QSE is a precipitation event that produces measurable precipitation for at least one drainage area and is preceded by 48 hours with no measurable precipitation in any drainage area.  General Permit §XI(B)(2)

83.    Once the storm water samples have been collected, the General Permit requires that Permittee's must deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

84.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Permittee on a facility-specific basis.  General Permit § XI(B)(6)(c)

85.    Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations must be conducted during daylight hours on days without precipitation and must include observing each drainage area; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs and must include observing storm water runoff for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris.  General Permit § XI(A)

Annual Comprehensive Facility Evaluation

86.    The General Permit requires Permittees to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

87.    Section XVI(A) of the General Permit requires all Permittees to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

88.    Annual Reports are auto populated by SMARTS from Permittees' answers to a series of twelve questions, which require mostly yes/no responses.

89.    The questions include whether the Permittee has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all required sampling locations at its facility; and where the facility is located within an impaired watershed, the Permittee has assessed whether any of the receiving water impairments are present at their facility.

90.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

Certification of Compliance Documents

91.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## VI.    SPECIFIC FACTUAL ALLEGATIONS

### A.    The Facility

92.    Builders First Source (BFS), located at 1351 East Beamer Street in Woodland, California, is a facility which fabricates and distributes wooden trusses and wall panels and includes trucking operations.

93.    Plaintiff is informed and believes that the Facility falls under standard industrial classification ("SIC") code 2452-Prefabricated wood buildings, based on public records.

94.    SIC Code 2452 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

95.    Based on the foregoing, Plaintiff alleges that Defendant is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

### C.    Defendant's General Permit Violations

Deficient SWPPP/Failure to Follow SWPPP

96.    Since at least January 27, 2021, Defendant has failed to implement an adequate SWPPP for the Facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1),

II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

97. Defendant's continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Builders First Source (BFS), as well as by required documents which have not been uploaded to SMARTS.

98. Defendant's continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

99. As is more particularly described in **Exhibit A**, attached hereto and incorporated herein by reference, Plaintiff's Notice issued to Defendant on January 26, 2026, delineated numerous deficiencies in Defendant's SWPPPs and Site Maps uploaded to SMARTS on September 25, 2020, and July 28, 2025.

100. The 60-day notice period on Plaintiff's Notice expired on March 27, 2026, without correction of the violations alleged in Plaintiff's Notice.

101. Defendant's current and historical SWPPPs and Site Maps do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

102. Defendant's current SWPPP has not been revised as required by the General Permit to reflect true conditions at the Facility.

103. Defendant's current and historical SWPPPs and Site Maps contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the Facility; and all mandatory required sampling parameters associated with the Facility's industrial materials and chemicals.

104.    Defendant has failed and continues to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

105.    In addition, Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

106.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

107.    Plaintiff alleges that Defendant's monitoring and reporting program at Builders First Source (BFS) in Woodland is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

108.    Defendant's deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

109.    Defendant's deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Defendant and government agencies, as well as other relevant documents maintained by Defendant and governmental and regulatory agencies.

110.    Since January 27, 2021, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

111.    In addition, Defendant has failed to conduct monthly visual observations at the Facility since at least January 27, 2021.

112.    Defendant has failed to collect storm water samples from each drainage area at all mandatory sampling locations at its Facility, for each QSE where sampling is performed,

pursuant to General Permit § XI(B), as is more particularly described in the Notice attached hereto as **Exhibit A**.

113.    Defendant has failed to analyze the Facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

<u>Falsification of Annual Reports, SWPPPs/Site Maps and Notice of Termination</u>

114.    Since January 27, 2021, Defendant has submitted to the Water Board and public via SMARTS inaccurate and falsified Annual Reports, SWPPPs, and a Notice of Termination, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

115.    Defendant's submission of inaccurate and falsified Annual Reports, SWPPPs/Site Maps and a Notice of Termination and its continuing failure to retract its false statements to the Water Board and the public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant.

116.    Defendant's submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

117.    Defendant's submission of false statements to the Water Board and the public is ongoing and continuous.

<u>Failure to Implement Adequate Best Management Practices</u>

118.    Since at least January 27, 2021, Defendant has failed to identify and implement adequate Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit.

119.    Defendant's failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

120.    Defendant's BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

121.    Defendant's BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

122.    Defendant's BMP deficiencies are more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.

Failure to Train Employees

123.    Since at least January 27, 2021, Defendant has failed to implement and train an onsite compliance Team at the Facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

124.    The General Permit requires all Permittees to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing an onsite compliance Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

125.    Defendant's failure to implement and train a compliance Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

126.    Defendant's failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by eyewitness reports and inspections

conducted by representatives of Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

127. Defendant's failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by Defendant's ongoing and continuing General Permit violations.

128. Other evidence of Defendant's failure to implement and train an onsite compliance Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained, as well as that some of the designated Team Members are regional employees not assigned to work at the Woodland Builders First Source (BFS) Facility.

129. Defendant's failure to implement and train an onsite compliance Team in violation of the General Permit is ongoing and continuous.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

130. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

131. The General Permit requires Permittees to develop and implement on an ongoing basis an adequate SWPPP, including a detailed and accurate Site Map.

132. As outlined herein, Defendant has failed to develop, implement and maintain an adequate SWPPP and Site Map for its Facility.

133. Each day since January 27, 2021, that Defendant has failed to develop, implement and maintain an adequate SWPPP and Site Map for its Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

134.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement, maintain, and certify and submit to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

135.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

136.    The General Permit requires Permittees to develop and implement on an ongoing basis a monitoring and reporting program that complies with the terms of the General Permit.

137.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for the Builders First Source (BFS) facility.

138.    Each day since at least January 27, 2021, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

139.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of False Documents to the Regional Water Board/SMARTS**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

140.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

141.    Section XVI of the General Permit requires that all documents submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides

COMPLAINT – Page 23

significant penalties for submitting false information. As delineated herein, Defendant made false representations in the Facility's Annual Reports, SWPPPs/Site Maps and a Notice of Termination and has failed to correct or retract the false statements.

142.    Each time since January 27, 2021, that Defendant has made false or misleading statements in documents submitted to the Water Board via SMARTS under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

143.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's failure to withdraw any of the false and/or incomplete statements submitted to the Water Board and the public via SMARTS.

**FOURTH CAUSE OF ACTION**
**Failure to Implement Appropriate BMPs**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

144.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  .

145.    As alleged herein, Defendant has failed to properly implement the required Best Management Practices ("BMPs") at the Facility.

146.    Each day since at least January 27, 2021, that Defendant failed to implement the required minimum BMPs in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

147.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate BMPs at its Facility.

**FIFTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

148.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

149.    Section X(D)(1) of the General Permit requires each facility to establish an onsite compliance Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate Team members to implement the SWPPP and conduct required monitoring when the regularly assigned Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

150.    Section X(H)(f) of the General Permit also requires that Permittees ensure that all Team members implementing the various compliance activities of the General Permit are properly trained.

151.    Since at least January 27, 2021, Defendant has failed to properly implement and train an onsite compliance Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Builders First Source (BFS) facility in compliance with all standard conditions of the General Permit;

3.    Order Defendant to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

4.     Order Defendant to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

5.     Award such other and further relief as may be just and proper.

Dated:  June 1, 2026                              Respectfully,


By: ___/S/_Adam D. Brumm_____
       Adam D. Brumm
       Attorney for Plaintiff

# EXHIBIT A



*Central Valley* **Eden Environmental Defenders**

January 26, 2026

<u>Via US Mail, Certified and Email</u>

Ulises Gomez            Email:  Ulises.Gomez@bldr.com
Operations Manager
Builders First Source
1351 East Beamer Street
Woodland, CA 95776

<u>Via US Mail</u>

CT Corporation
Agent for BFS Group
330 N. Brand Blvd
Glendale, CA  91203

Peter Jackson          Peter.Jackson@bldr.com
Steve Herron           Steve.Herron@bldr.com
Pete Beckman           Pete.Beckman@bldr.com
Builders FirstSource, Inc.
6031 Connection Drive, Suite 400
Irving, Irving  75039

Ivan Bilbao
PanOcean Inc.
2511 Kings Point Drive
Atlanta, GA  30338

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners, Legally Responsible Person(s), Duly
Authorized Representative(s) and/or Facility Managers of BFS Group of California LLC, dba
Builders First Source ("BFS"):

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against **BFS Group of**

1520 E. Covell Blvd #B5                    Telephone:  (800) 545-7215
Davis, CA  95616                           Email:  admin@edendefenders.org

**California LLC, Builders FirstSource, Inc., PanOcean Inc., Ulises Gomez, Daniel Vigil, Peter Jackson, Pete Beckman and Steve Herron** ("Responsible Parties"), as well as other corporate officers and legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the BFS facility located at 1351 East Beamer Street in Woodland, California.

EDEN is an environmental citizen's membership group established under the laws of the state of California to protect, enhance, and assist in the restoration of all Waters of the United States in California for the benefit of the ecosystems of those water bodies, as well as the communities located nearby.

EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Facility's Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, rafting, paddle boarding, fishing, boating, swimming, walking, hiking, bird watching, picnicking, viewing wildlife and other recreational activities.

At least one of EDEN's current members has standing to bring suit against the Responsible Parties, as their continued refusal to comply with or enforce compliance with the Federal Clean Water Act (CWA) has had an adverse effect particular to the specific member(s) of EDEN and has resulted in actual harm to them.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides the Responsible Parties with notice of the violations which continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against the Responsible Parties under CWA section 505(a) for the violations described more fully below.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) ("General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"),

indicates that on or around October 1, 2020, BFS submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit (under BMC Woodland BFS) and was assigned  Waste Discharger Identification number ("WDID") 5S57I028925.  On July 8, 2025, BFS reapplied for the General Permit after improperly terminating coverage on June 11, 2025.  BFS's current WDID is 5S57I031168.

EDEN alleges that BFS has committed ongoing violations of the CWA and the General Permit by failing to comply with all standard conditions of the General Permit, as discussed below.

## II.    THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  The Facility

BFS's permanent facility address is 1351 East Beamer Street in Woodland, California.

BFS is a facility which fabricates and distributes wooden trusses and wall panels and distributes lumber.  Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 2452 - prefabricated wood buildings and components.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2452, as well as EDEN's investigation into Facility operations, storm water run-off discharges from industrial business such as BFS contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), various types of oil and grease (O&G), Chemmical Oxygen Demand (COD), Ammonia, Iron, Volatile Organic Compounds (VOCs) and Zinc.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed above is a potential source of pollutants at the Facility.

### B.  The Affected Receiving Waters

The Facility discharges into Lower Cache Creek and the City of Woodland's MS4 system, which reaches the Sacramento River via the Tule Canal and Yolo Bypass ("Receiving Waters").  The Facility's Receiving Waters are impaired for Boron, Diazinon, Dissolved Oxygen and Mercury.

The Sacramento River is a water of the United States.  The CWA requires water bodies such as the Sacramento River to meet water quality objectives that protect specific Beneficial Uses.  A water body is impaired pursuant to Section 303(d) of the CWA when its Beneficial

Uses are not being achieved due to the presence of one or more pollutants, referred to herein as "Receiving Water Impairments."

## III.    VIOLATIONS OF THE CWA AND GENERAL PERMIT

### A.  Permit Application and Registration Violations

*1.  Failure to Certify New Discharger Receiving Water Evaluation*

Permit Section VII.B provides that New Dischargers applying for standard NOI coverage who will be discharging to a water body with a 303(d) listed impairment **are ineligible for coverage** unless the Discharger submits data, prepared by a Qualified Industrial Stormwater Practitioner (QISP), demonstrating that:

1.  The Discharger has eliminated all exposure to storm water of the pollutant(s) for which the water body is impaired, has documented in its Storm Water Pollution Prevention Plan (SWPPP) the specific procedures taken to prevent exposure on-site (as best management practices), and has retained documentation such as photographs and other proof of no exposure and BMP implementation at the facility; or

2.  The pollutant for which the water body is impaired is not present at the Discharger's facility, and the Discharger has included this information in its SWPPP and retained additional documentation evidencing this finding at the facility; or

3.  The discharge of any 303(d) listed pollutant will not cause or contribute to an exceedance of a water quality standard.  This is demonstrated by storm water samples collected by the Discharger at the facility which are analyzed for the Receiving Water Impairment(s) present at the facility and confirmed to be equal or less than all applicable Water Quality Objective effluent limits and all Numerical Action Limits set by the EPA and Water Board for the applicable pollutant.

Pollutants confirmed to be stored, handled, and/or produced onsite by industrial processes (including waste byproducts) at BFS's facility include the following Receiving Water Impairment(s)**:  Dissolved Oxygen, as measured by Chemical Oxygen Demand (COD).  COD is a required SIC Code sampling parameter for the Facility and is associated with sawdust, raw lumber and wood scrap and waste present at BFS.**

BFS meets the definition of a "New Discharger" as defined in 40 CFR 122.2 because it commenced operations after 1979 and did not receive General Permit coverage prior to July 1, 2015.

BFS has failed to certify and submit to SMARTS documentation prepared by a QISP demonstrating compliance with one of the three options provided in Permit Section VII.B related to Dissolved Oxygen, as measured by Chemical Oxygen Demand (COD), which is a pollutant associated with industrial processes occurring regularly at the facility. **BFS is thus ineligible for coverage under the General Permit and is subject to immediate revocation of its Permit coverage.**

BFS has been in ongoing violation of General Permit Section VII.B since July 8, 2025, continuing to the present.

### 2. *Improper Termination of Permit Coverage*

Between October 1, 2020, and June 11, 2025, the Facility maintained Permit coverage under WDID No. 5S57I028925, with the listed Operator Name "BMC West Corp" and the listed Facility Name "BMC Woodland BFS".

On June 5, 2025, BMC Woodland BFS submitted a Notice of Termination of Permit coverage for WDID No. 5S57I028925, which the Water Board approved on June 11, 2025. The Notice of Termination was submitted with the false statement that operation of the facility had been transferred to a new owner entity.

BFS did not maintain Permit coverage between June 11, 2025 and July 8, 2025, as it waited nearly a month to reapply after terminating its coverage on false pretenses before applying for coverage under BFS Group of California, LLC, WDID 5S57I031168.

Daniel Vigil, who is employed by BFS and its Safety Manager and who is BFS' Duly Authorized Representative for both Permit coverages certified and submitted all documents on SMARTS for BMC Woodland BFS-WDID No. 5S57I028925, including the Notice of Termiation. Documents are currently being submitted on SMARTS for BFS Group of California-WDID 5S57I031168 by Ulises Gomez, BFS' Operations Manager. Mr. Vigil remains employed as BFS' Safety Manager.

EDEN's investigation also confirms that Facility operations currently conducted by BFS are identical to those conducted by BMC Woodland BFS; and BFS' SIC code [2452] is the same SIC code that BMC Woodland BFS listed in its Permit Registration Documents.

Permit Section XXI.R, which is relevant to this issue, refers to termination of Permit coverage only when **operation** of the facility is ***transferred*** to another entity. Section XXI.R does not authorize termination of Permit coverage when the legal name of the entity operating the facility changes, but facility operations remain constant.

Thus, the "New Owner/Operator" option for termination of Permit coverage is to be utilized when a facility is purchased by an <u>unrelated entity</u> and is not to be used for facilities with ongoing operations which simply undergo a <u>change in the name of the operating entity</u>, which is the case here.

Specifically, BMC West Corp merged with Builders FirstSource, Inc.  The merger allowed BMC to retain its branding "Build with BMC" and operations.  Nothing changed but the name.  On August 27, 2020, the merger was officially announced.  Thus, as of the date that BMC Woodland BFS applied for coverage (October 1, 2020), the merger had already transpired.

The correct document to submit to SMARTS is a Permit Change of Information (COI) to change the name of the Operator from BMC West Corp to BFS Group of California LLC, rather than a Notice of Termination.

The Notice of Termination submitted by Daniel Vigil not only contains false and misleading information but also is invalid.  EDEN believes that BFS intentionally terminated its Permit coverage held in the name of BMC Woodland BFS, rather than submitting a COI to change the operator name, so that it could gain the benefit new Permittee status without the violation and SMARTS documentation history associated with BMC's Permit coverage.

For purposes of this Notice Letter, EDEN considers Permit violations occurring during the pendency of BMC Woodland BFS's Permit coverage to be imputed onto BFS' new Permit because the violations were personally committed by employees of BFS after the merger had transpired.  These same individuals continue to be employed in their same capacity by BFS.

BFS has been in ongoing violation of General Permit Sections II, XXI.A, XXI.K, XXI.L, XXI.N, XXI.Q and  XXI.R since June 11, 2025, continuing to the present.

### B.  <u>Failure to Continuously Maintain a Sufficient SWPPP and Site Map</u>

The General Permit requires Dischargers to continuously maintain an adequate Storm Water Pollution Prevention Plan (SWPPP) and Site Map at all times and to implement all provisions of their SWPPP. (Sections II.B.1.b, X, X.B)

**BFS SWPPPs and Site Maps have been continuously deficient since at least October 1, 2020.**

BFS' SWPPP and Site Map certified and submitted to SMARTS on July 8, 2025, prepared by BSI GroupBSI Group BSI Group, are inadequate and fail to comply with the requirements of the General Permit as discussed below.

In addition, BFS' prior SWPPP and Site Map certified and submitted to SMARTS on September 25, 2020, under WDID 5S57I028925 are also deficient.

1.  **BFS's Site Map(s) do not include all minimum required components for Site Maps as mandated by Permit Section X.E, as follows:**

(a)   Accurate depiction of the Facility boundary. (Section X.E.3.a)

The property boundary depicted on the Site Map is inaccurate and only depicts the lower 12-acre portion of the property.

(b)   Accurate depiction of  industrial drainage areas.

The Site Map improperly designates only the southern 12-acre portion of the property as industrial.  EDEN's investigation confirms that industrial activities take place in the entirety of the 24-acre property.

Further, a drainage area is not non-industrial unless the discharges in that area are composed entirely of storm water that has not been exposed to industrial materials or activity.  A drainage area (including an employee parking lot) cannot be non-industrial if it receives storm water discharges that have emanated from or passed through an industrial area, including an area where materials are stored outdoors. (Sections X.E.3, X.H.1.a.viii and XVII)

(c)   All Facility entrances (Section X.E.3).

None of the entrances are depicted on the Site Map.  EDEN's investigation confirms that there are four entrances:  two adjacent entrances in the southwest corner, and one at the southeast corner of Facility, entering Beamer Street.  There is a fourth entrance in the northwest portion of facility leading to Commerce Avenue which appears to be unused at this time.

(d)   Accurate depiction of all storm water drainage areas within the Facility boundary. (Section X.E.3, X.I.2)

The Site Map fails to depict any drainage areas.  EDEN's investigation confirms the Facility should be divided into at least six drainage areas.

(e)   Accurate direction of storm water flow within each drainage area. (Sections X.E.3, X.I.2)

Most of the arrows on the Site Map depicting the alleged direction of storm water flow are inaccurate.

(f)     A sampling location for every discharge location within each drainage area. (Sections X.E.3, X.I.2)

Only one sampling location is depicted, when there should be at least six, corresponding with the total number of drainage areas.

(g)     Sampling locations which are representative of facility operations. (Sections X.E.3, X.I.2, XI.B)

Only one sampling location is depicted on the Site Map, which is not representative of the entirety of facility operations in each industrial drainage area.

(h)     Locations of storm water collection and conveyance systems associated with discharge locations (i.e. storm drain inlets and underground conveyances). (Section X.E.3.b)

The Site Map is missing multiple onsite drain inlets. EDEN's investigation confirms there are a total of 19 drain inlets onsite.  However, BFS' Site Map depicts only 8 drain inlets.  In addition, the Site Map inaccurately depicts the underground conveyance system and the connections of the underground pipes to the City's MS4 system.

(i)     Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges. (Section X.E.3.a)

  EDEN's investigation confirms that there are two nearby City MS4 inlets: one MS4 inlet located just west of the facility on Beamer Street; and the second MS4 inlet located a few feet east of BFS' southeast entrance, both of which receive storm water discharges from the Facility.

(j)     On-site surface water bodies. (Section X.E.3.a)

  The Map does not depict the drainage ditch that runs west to east at the northern perimeter, intersecting with a drainage ditch that runs north-south along a portion of the eastern perimeter of the facility.

(k)     Areas of soil erosion. (Section X.E.3.a)

There are many areas where soil is eroded in the northern 12-acre portion of the facility, which is entirely pervious.

(l)     All locations where materials are directly exposed to precipitation. (Section X.E.3.e)

The Site Map omits all areas of outdoor storage of scrap and materials in the northern 12 acres and also depicts several of the storage areas as being covered, when they are simply under an awning that is exposed to the elements. The Site Map also fails to depict operations occurring within the manufacturing building, which is equipped with 12 rollup doors left open during business hours so that pollutants from industrial operations occurring within the buildings are exposed to precipitation.

(m)    Locations where identified significant spills or leaks have occurred. (Section X.E.3.e)

(n)    All areas of industrial activity subject to the General Permit, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and all other areas of industrial activity that may have potential pollutant sources (Section X.E.3.f).

Many areas of outdoor storage have been omitted from the Site Map, and it does not depict the following operations: loading/unloading, sawing of raw lumber and fueling area, and multiple operations and equipment on rooftops and in between buildings.

2.    The SWPPP does not include all the required elements, as indicated below:

A.    Adequate and accurate discussion of the **Facility's Receiving Waters** and associated impairments (Sections XI.B.6.e, X.G.2.ix).

The SWPPP fails to include the correct Receiving Water Impairments for the Facility (omitting Diazinon and Dissolved Oxygen) and inaccurately indicates that no Receiving Water Impairments are present at the Facility.

B.    A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (Section X.G.1.a)

The SWPPP omits a <u>discussion</u> of all industrial operations occurring onsite, mentioning only that the operations exist, but not describing how, when or where they occur.  This is insufficient to comply with the Permit's requirement that industrial processes occurring at the Facility be adequately described.

C.      A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials. (Sections X.A.3, X.F, X.G.1.a)

The SWPPP is missing a complete list of Industrial Materials and fails to include all industrial materials handled at the Facility, the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials.

The BMP Summary Table on p. 13 and Attachment 5-Material Inventory list only categories of pollutants such as "plastics", "waste", "dust", "solvents, lubricants and other maintenance-related products", "assorted fluids" and "particulates", without identifying the actual materials or their associated pollutants.

Citing types of industrial materials instead of listing the actual materials is a practice that is noncompliant with Permit Section X.F, which requires that SWPPPs include a complete and accurate list of <u>all</u> materials handled at the Facility, without any exceptions.

EDEN's investigation, including a thorough review of public records held by regulatory agencies, confirms the following industrial materials handled at the Facility which have been omitted from the SWPPP:

Diesel Exhaust Fluid, Dyed Diesel Fluid, Propane, Delo 400 LE SAE 15W-40, metal truss connector plates, metal connectors, scrap metal, plastic lumber wrap, nails/fasteners.

There are likely numerous other industrial materials associated with BFS' industrial processes which have been omitted from the SWPPP.

D.      Accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces. (Section X.G)

The Pollutant Source Assessment in the BMP Summary Table and Attachment 5 is deficient for several reasons. First, it fails to consider all industrial materials handled at the facility, as discussed above.

Second, invalid indicator pollutants are associated with the industrial materials listed in Table 2. For example, potential pollutants listed are groups or types of materials, rather than indicator pollutants that can be associated with sampling parameters.

The Facility's Pollutant Source Assessment must list each individual industrial material associated with its industrial processes and assign as additional sampling parameters an indicator pollutant that is designed to detect each potential pollutant that may be exposed to storm water.

E.      The corresponding **sampling** parameters associated with a proper Pollutant Source Assessment, to include all pollutants present at the Facility which have the potential to be exposed to storm water (Section XI.B.6).

EDEN's investigation (including review and analysis of documents obtained from local, state and federal regulatory agencies) confirms that Ammonia, Iron, Volatile Organic Compounds (VOCs) and Zinc are present in industrial operations at the Facility, all of which are exposed to storm water. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Permit Section XI.B.6.c.

F.      An appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements and a detailed and accurate description of all discharge locations (Section X.I)

The SWPPP does not identify the team members assigned to conduct monitoring requirements, nor does it include an accurate and detailed description of all discharge locations.

G.      An appropriate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events. (Section X.I)

EDEN's investigation confirms that there are six drainage areas at the facility and at least six separate discharge locations. The SWPPP does not indicate how many drainage areas are located at the Facility, nor does it include an accurate description of discharge areas.

H.     A **BMP Summary Table** summarizing each BMP currently being implemented at the Facility; the associated industrial pollutant the BMP is designed to reduce or prevent; the frequency, times of day or conditions when the BMP is scheduled for implementation; the individual and/or position responsible for implementing the BMP; the procedures, equipment and/or tools necessary to implement the BMP effectively; and the locations within each area of industrial activity where the BMP is to be implemented (IGP Sections X.H.4 and X.H.5).

The BMP Summary Table does not include the associated industrial pollutant the BMP is designed to reduce or prevent as an indicator pollutant capable of being transformed into a sampling parameter (except for oil & grease); the frequency, times of day or conditions when the BMP is scheduled for implementation; the individual and/or position responsible for implementing the BMP; and the procedures, equipment and/or tools necessary to implement the BMP effectively.

I.     Adequate and detailed information about the Facility's **Pollution Prevention Team** (Section X.D).

The SWPPP lists only the titles of the Facility's Pollution Prevention Team members, which is insufficient.

The SWPPP and Site Map referenced above also contains objectively false information certified as true and correct by the Facility's duly authorized representative and/or legally responsible persons, in violation of state and federal laws.

BFS has been in ongoing violation of General Permit Sections II.B.4.f and X since October 1, 2020 July 1, 2015, continuing to the present.

### C.  <u>Failure to Comply with Facility SWPPP</u>

The Facility's current and prior SWPPPs indicate that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed below, BFS missed collecting storm water samples in the reporting years 2020-21; 2021-22; 2022-23; 2023-24; 2024-25; and 2025-26 to date.

Permit Sections X.A and X.H.1.g require all Dischargers to develop and implement management procedures to ensure that appropriate staff implements all elements of the Facility's SWPPP, including the Monitoring Implementation Plan.

BFS has been in ongoing violation of General Permit Sections X.A and X.H.1.g since October 1, 2020, continuing to the present.

### D. Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Permit Section XI requires Dischargers to develop and implement a storm water monitoring and reporting program prior to conducting industrial activities. Dischargers have an ongoing obligation to revise their monitoring program as necessary to ensure compliance with the General Permit.

1. *Submission of Late Annual Report*

Permit Section XVI mandates that all Dischargers certify and submit to SMARTS an Annual Report no later than July 15th of each reporting year.

BFS submitted its Annual Report for the reporting year 2022-23 on May 16, 2025—two years late—and only after it received three formal Notices of Non-Compliance from the Regional Water Board.

2. *Failure to Conduct Visual Observations and Maintain Required Records*

Permit Section XI.A requires all Dischargers to conduct visual observations at least once each month, and to conduct sampling observations at the same time sampling occurs at a discharge location.

Monthly visual observations must be conducted during daylight hours and scheduled facility operating hours, on days without any precipitation.

Monthly visual observations must include a visual observation of each drainage area at the facility for the following: (a) the presence or indication of prior, current, or potential unauthorized NSWDs and their sources; (b) authorized NSWDs, sources, and associated BMPs to ensure compliance with Section IV.B.3; and (c) all outdoor industrial equipment and storage areas, all outdoor industrial activities areas, and all other potential source of industrial pollutants.

Section XI.A.3 requires all Dischargers to complete contemporaneous records of all visual observations. The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 mandates that Dischargers retain either paper or electronic copies of visual observation records for at least five (5) years.

Between October 1, 2020 and the present, BFS has failed to conduct monthly visual observations pursuant to Permit Section XI.A and to maintain adequate contemporaneous written Visual Observation Reports confirming that the required visual observations were conducted.

BFS' Annual Reports also confirm that it did not regularly conduct monthly visual observations and maintain contemporaneous written records.

3. *Failure to Collect and Analyze the Required Number of Storm Water Samples*

BFS has failed to collect, analyze and report the required minimum number of annual storm water runoff samples, in violation of Permit Sections XI.B.2 and XI.B.11.a.

Permit Section XI.B.2 requires Dischargers to collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected, analyzed and reported pursuant to all Permit requirements, a valid and accurate explanation must be included in the facility's Annual Report.

BFS has failed to certify and submit to SMARTS the required number of storm water run-off sample analyses for the reporting years 2020-21; 2021-22; 2022-23; 2023-24; 2024-25; and the first half of 2025-26, and has not provided an adequate and/or accurate explanation for its failure to do so.

**In fact, the Facility has not collected and analyzed any storm water runoff samples since March 28, 2022.**

Furthermore, pursuant to data collected from the National Oceanic and Atmospheric Administration ("NOAA"), there were sufficient storm events occurring near 1351 East Beamer Street in Woodland during Facility operating hours within the reporting years where required storm water sample collections were missed to have allowed the Facility to collect at least the minimum number of storm water samples.

4. *Failure to collect Samples from all Discharge Locations within each Drainage Area*

Permit Section XI.B.4 requires Dischargers to collect samples from all discharge locations at all drainage areas, regardless of whether the discharges are substantially similar. The sampling locations chosen must also be representative of industrial operations occurring within each drainage area.

The General Permit defines "drainage area" as the "area of land that drains storm water, sediment, pollutants, and dissolved materials to a common discharge location." (Attachment C to General Permit-Glossary). Storm water drainage includes both above-ground storm water flow (surface flow) and storm water entering underground storm water conveyance systems.

EDEN's investigation confirms that there are six industrial drainage areas and at least six discharge locations at the Facility which are not depicted on the Site Map, nor are they discussed in the SWPPP.

The storm water runoff sample analyses BFS certified and submitted to SMARTS for storm water samples collected on the dates listed below did not include samples from all discharge locations at the Facility:

| |
|---|
| 1/29/2021 |
| 10/26/2021 |
| 12/28/2021 |
| 3/30/2022 |

5. *Failure to Analyze Storm Water Samples for All Required Parameters*

Permit Sections XI.B.6.a and XI.B.6.b require BFS to analyze its storm water samples for pH, Total Suspended Solids (TSS) and Oil & Grease (O&G). Section XI.B.6.d requires the sampling parameter COD, which is associated with the facility's SIC code (2452 ).

In addition, Permit Section XI.B.6.c requires analysis of the sampling parameters identified in a Pollutant Source Assessment prepared in accordance with Sections X.F and X.G.

EDEN's investigation confirms the following pollutants associated with facility industrial operations are exposed to storm water and must be designated as additional storm water sampling parameters: Ammonia, Iron, Volatile Organic Compounds (VOCs) and Zinc.

There are likely multiple other required sampling parameters; however, EDEN is unable to ascertain the parameters because BFS has omitted from its SWPPP a complete list of the industrial materials present at its facility.

The storm water sample analyses BFS certified and submitted to SMARTS for samples collected on the dates listed below did not include all required additional sampling parameters as outlined above.

| |
|---|
| 1/29/2021 |
| 10/26/2021 |
| 12/28/2021 |
| 3/30/2022 |

BFS has been in ongoing violation of General Permit Sections XI, XI.A, XI.B, XI.C, XXI.H, XXI.J and Attachment H since October 1, 2020, continuing to the present.

### E.  Failure to Comply with Permit Certification Requirements by Including False Statements in Documents Certified and Submitted to SMARTS

Permit Sections II.A.1 and XXI.K.4 mandate that all Permit Registration Documents be certified and submitted to SMARTS by the Discharger's Legally Responsible Person (LRP); and that all other documents be certified and submitted by the Discharger's LRP or Duly Authorized Representative (DAR).

Section XXI.K.4 clarifies that LRP eligibility is limited to responsible corporate officers or facility managers; and XXI.K.3 provides that any document certified and submitted to SMARTS by an unauthorized or ineligible LRP or DAR is invalid.

All DARs must be designated by the Discharger's LRP, who is ultimately responsible for overseeing the facility's DAR(s) and for any documents certified and submitted to SMARTS by a DAR.

Permit Section XXI.L further provides that any person signing, certifying and submitting documents to SMARTS must make the following certification for each document submitted:

> *I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. **I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.**

In addition, the Water Board requires that each individual designated as a Discharger's LRP or DAR complete, sign and return a SMARTS Electronic Authorization Form to complete the SMARTS registration process. (Water Board Guidance Publication "eAuthorization Form" (March 10, 2021); General Permit Section XXI.K, 40 CFR §122.22)

SMARTS Electronic Authorization Forms include the following language:

*I, (signatory), certify that I meet the signatory requirements to sign applications and/or reports* [specified in General Permit Section XXI.K.4 and 40 CFR 122.22].

*My signature on this form also certifies that I agree my user ID, password and response to security challenge questions constitute my electronic signature and any information I indicate I am electronically certifying contains my signature. I understand that I am legally bound, obligated or responsible by use of my electronic signature as much as by a handwritten signature.*

*I certify that the above information is true and correct. By signing this registration form, I agree on behalf of myself and [Discharger] to be bound by its terms.*

Both Ulises Gomez (current LRP) and Daniel Vigil (current DAR) have signed and returned to the Water Board SMARTS Electronic Authorization Forms which certify that they agree to be bound by the terms included in the Forms, on behalf of themselves and BFS.

BFS has failed to comply with the standard conditions of the General Permit found in Sections II.A.1, XXI.K.1, XXI.L, XXI.N and XXI.Q, as well as 18 USC §1001 and CWA Section 309) by submitting and certifying to SMARTS Permit Registration Documents, SWPPPs and Site Maps, Annual Reports and a Notice of Termination containing objectively false information, as indicated below.

1. ***False Statements in Annual Reports***

BFS has made false statements to specific questions contained in its Annual Report as set forth below and in Table 1.

(a) <u>Annual Report Question 1-Monthly Visual Observations</u>: Question No. 1 asks the Discharger: "*Did you conduct monthly visual observations in accordance with Section XI.A.1?*"

BFS responded "*Yes*" to Question No. 1.  However, EDEN's investigation confirms that BFS did not conduct monthly visual observations during the reporting years as required by Permit Section XI.A.1.

(b) <u>Annual Report Question 2- Sampling Event Visual Observations</u>:  Question No. 2 asks the Discharger: "*Did you conduct sampling event visual observations at each discharge location where a sample was obtained in accordance with Section XI.A.2?*"

BFS responded "*Yes*" to Question No. 2.  However, EDEN's investigation confirms that BFS did not conduct sampling event visual observations during the reporting years as required by Permit Section XI.A.2.

(c) <u>Annual Report Question No. 3/Attachment 1-Number of Samples</u>: "***Did you sample the required number of Qualifying Storm Events during the reporting year*** *for all discharge locations, in accordance with Section XI.B*?"  *If not, explain why in Attachment 1.*

The required number of annual storm water samples to be collected and analyzed is four (two in the first half of the year [July 1-December 31]; and two in the second half of the year [January 1-June 30].

BFS correctly responded *"No"* to Question No. 3 but provided a false answer in Attachment 1 to explain why it failed to collect the required number of samples.  (See Table 1)

Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of BFS's regular business hours such that the required number of samples could have been collected.

(d) <u>Annual Report Question 4-Discharge Locations</u>:  Question No. 4 asks the Discharger "*How many storm water discharge locations are at your facility?* "

BFS responded falsely to Question No. 4 by indicating that there is only one discharge location at its facility, when in fact there are at least six.

(e) <u>Annual Report Question No. 7/Attachment 2 – List of Identified Pollutants within the Impaired Watershed</u>:  Question No. 7 asks the Discharger to respond "*Yes*" or "*No*" to whether each of the (auto populated) identified pollutants within the impaired watershed in which the facility is located are present at its facility.

BFS responded to Question No. 7 that none of the Receiving Water Impairment pollutants located within its impaired watershed were present at its facility.  However, the impaired pollutant **Dissolved Oxygen, as measured by Chemical Oxygen Demand (COD)** is present at its facility, as discussed above.

(f) <u>Annual Report Question 12-Records</u>:  Question No. 12 asks the Discharger "*Did you retain records on-site for the reporting year in accordance with XXI.J.3?*

BFS responded "*Yes*" to Question No. 12.  However, EDEN's investigation confirms that BFS did not retain records on-site for the reporting year in accordance with Permit Section XXI.J.3.

| TABLE 1 – FALSE STATEMENTS IN ANNUAL REPORTS | | | | |
|---|---|---|---|---|
| **Reporting Year** | **Date Submitted** | **By Whom** | **IP Address** | **False Responses to Questions Contained in Annual Reports** |
| 2020-21 One SW sample | 6/9/2021 | Daniel Vigil SMARTS User Account 650797 | 198.143.47.3 | Question Nos. 1,  4, 7 (Attachment 2), No. 3 (Attachment 1: "*Not enough rain during business hours*") |
| 2021-22 Three SW Samples | 6/28/2022 | Daniel Vigil | 198.143.33.27 | Question Nos. 1, 4, 7 (Attachment 2), 3 (Attachment 1: "*Not enough rain.*") |
| 2022-23 No samples | 5/16/2025 | Daniel Vigil | 198.143.34.26 | Question Nos. 1, 2, 4, 7 (Attachment 2); 3 (Attachment 1: "*Only one QSE occurred during the reporting period*"<br><br>Admits no records were retained onsite during the reporting period. |
| 2023-24 No samples | 5/16/2025 | Daniel Vigil | 198.143.34.26 | Question Nos. 4, 7 (Attachment 2); 12<br><br>Admits no monthly observations were conducted but also falsely indicates records were maintained of observations. Admits samples were not collected. |
| 2024-25 No Samples | 6/5/2025 | Daniel Vigil | 198.143.34.17 | Question Nos. 1, 4, 7 (Attachment 2), 12<br><br>Admits samples were not collected. |

2. *__False Statements in SWPPPs and Site Maps__*

BFS's Legally Responsible Person Ulises Gomez certified and submitted to SMARTS on July 8, 2025, a SWPPP and Site Map which contain objectively false information, as set forth in Table 2 below.

Certification information

Documents Certified: Industrial - NOI/SWPPP and Site Map

Certifier Name: Ulises Gomez, Operations Manager/Certifier Password Hash: 24e28abe92fbd579c6245a69e76e41fa1c4ed06c6286c71a9b9f68d43215fedb

Certifier User Account ID: 729297, Certification Computer IP: 198.143.34.18

Certification Executed On: 07/08/2025 13:18:14/Confirmation Number: 729297-198.143.34.18-20250708131814

| TABLE 2 – FALSE STATEMENTS/OMISSIONS IN SWPPPs and SITE MAPS | | |
|---|---|---|
| **False Statement/Omission** | **Source/Cite** | **True Facts** |
| The total area of industrial operation at the facility is depicted as less than 12 acres (southern paved portion) | Site Map | The area of industrial operation is 24 acres.<br><br>Many acres of pervious ground surfaces in the northern portion of the property are used for wood cutting operations, evidenced by multiple waste bins located in that area which are full of scrap wood waste. Also, metal, scrap materials, broken equipment and other discarded materials are also stored in the pervious northern portion of the facility and trucks and equipment are parked there. |
| Facility boundary is depicted as including only the paved portion of the facility. | Site Map | The property is 24-acres in size. |
| Waste accumulation areas, Loading/Unloading, Cutting and Fueling Operations, | Site Map | Industrial operations include open debris boxes/waste bins; loading and unloading in nearly the entire |

| | | |
|---|---|---|
| Rooftop operations and others omitted from the Site Map | | southwestern portion of the facility; fueling operations, cutting of raw lumber in several outdoor areas; and multiple unknown operations of rooftops and in between buildings, none of which are depicted on the Site Map |
| There is only one drainage area and one discharge location at the facility. | SWPPP | There are at least six industrial drainage areas at the facility and at least six discharge locations. |
| All storm water flows to M1 outfall pipe | SWPPP/Site Map | Storm water discharges from the facility's boundaries onto Beamer Street.  Some of the drain inlets onsite connect to the City's MS4 on Beamer Street and others connect to the two outfall pipes in front of the main building, just east of the office. |
| The Facility collects storm water samples from Outfall M1 as described in the SWPPP and depicted on the Site Map. | SWPPP/Site Map | Not only is BFS failing to collect *any* storm water samples, but also the samples it has collected to date have not been from the area described in the SWPPP and depicted on the Site Map as "M1". |
| Surface drainage at the facility flows to 8 onsite drain inlets. | SWPPP/Site Map | There are 19 onsite drain inlets, two pipe outfalls (in southern portion) and a round drain hole dug in the ground in the SE section of the pervious area.  BFS has intentionally omitted and hidden 11 onsite drain inlets, two pipe outfalls and the round drain hole. |
| Many of the 8 drain inlets on the Site Map are depicted in an inaccurate location | Site Map | EDEN's investigation confirms this, as well as the fact that some of manholes depicted on the Site Map are actually drain inlets. |
| False Direction of Storm Water Flow | Site Map | Arrows in eastern portion of Site Map depicting storm water flow are largely false. |

| Omission of industrial operations occurring within the facility's buildings | Site Map/SWPPP | EDEN's investigation shows that the main building is equipped with 12 roll-up doors which remain open during business hours |
|---|---|---|
| The only MS4 connections are via swales and ditches | SWPPP/Site Map | Several onsite drain inlets connect directly to the City's MS4 system at Beamer Street.  In addition, there are two MS4 inlets on Beamer Street which receive storm water discharges that emanate from the facility's entrances onto Beamer Street. |
| There are no MS4 inlets which receive facility discharge | Site Map/SWPPP | There are two MS4 inlets located just east and west of the facility on Beamer Street which receive discharges from facility entrances. |
| Mercury and Boron are the facility's only Receiving Water Impairments. | SWPPP | Dissolved Oxygen and Diazinon are also facility Receiving Water Impairments |
| There are no Receiving Water Impairments present at BFS' Woodland facility | SWPPP | Dissolved Oxygen, as measured by COD, is present in copious amounts in raw lumber materials, sawdust, cardboard and wood scrap and waste. |
| All cutting of lumber is conducted under cover | SWPPP | EDEN's investigation confirms cutting of wood and lumber is conducted in numerous places out in the open or under an awning, fully exposed to precipitation. |
| "*Additional sumps and swales are present on the west side of the Facility; however, they receive run-on from adjacent facilities to the east and therefore not representative of the facility's industrial activities.*" | SWPPP, p. 8 | EDEN's investigation confirms that run-on from the facilities to the east and west does not in fact occur. Further, neither of these facilities is industrial, and they do not conduct any outdoor operations.  Further, run-on from the east could not possibly affect the west side of the facility, due to structures in the middle of the property. |

| Omission of all industrial materials and pollutants associated with the materials | SWPPP | The following pollutants are confirmed to be present at the facility, among others: Diesel Exhaust Fluid, Dyed Diesel Fluid, Propane, Delo 400 LE SAE 15W-40, metal truss connector plates, metal connectors, scrap metal, plastic lumber wrap, nails/fasteners. |
|---|---|---|
| Intentional obfuscation of members of BFS' Pollution Prevention Team | SWPPP | The PPT members are referred to only by titles, in an intentional effort to hide the fact that they are the same individuals as were members for BFS' prior Permit coverage under BMC Woodland BFS. |

3.  *__False Statements in Notice of Termination__*

On June 5, 2025, BFS employee Daniel Vigil certified and submitted to SMARTS a Notice of Termination of Permit coverage on the basis that operation of the Facility had been transferred from BMC West Corp. to BFS, falsely indicating that BFS was a "New Owner/Operator."

Certification Information

Name of Document Certified: Notice of Termination
Certifier Name: Daniel Vigil, Safety Coordinator
Certifier Password Hash:
812626fc92a4475c4e51ae77718dfbd9c64c80872f19c2bb2e746572d5fd6e05
Certifier User Account ID: 650797
Certification Computer IP: 198.143.34.17
Certified on  06/05/2025 13:14:56

On June 11, 2025, Water Board terminated Permit coverage for WDID No. 5S57I028925 on that false basis.

Contrary to the facts certified by BFS's employee in the Notice of Termination of BMC West Corp's Permit coverage, operation of the Facility was never *transferred from BMC West Corp to BFS*, as BFS has continuously operated the Facility since October 1, 2020.

The Notice of Termination also falsely indicates that the transfer of ownership/operation of the Facility occurred on May 13, 2025.  However, the merger between BMC and BFS was officially announced on August 27, 2020—years before May 13, 2025.

### 4.   *False Statements in NOI Permit Application*

On October 1, 2020, and again on July 8, 2025, BFSs' employees Ulises Gomez and Daniel Vigil certified and submitted to SMARTS Notices of Intent to Discharge Stormwater Associated with Industrial Activity (NOI- General Permit Application).

The NOIs submitted by Ulises Gomez and Daniel Vigil falsely indicate that the area of industrial operation at the Facility is 12 acres.  EDEN's investigation confirms that industrial operations are taking place at BFS's facility in the entirety of the 24-acre property.

Based on the foregoing, BFS has been in ongoing violation of General Permit Sections II.A.1, XXI.K.1, XXI.L, XXI.N and XXI.Q, since October 1, 2020, continuing to the present.

## F.   **Deficient BMP Implementation**

Permit Sections I.C, V.A and X.C.1.b require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

At the minimum, all Dischargers are required to implement adequate BMPs in the following areas:  Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training, and Quality Assurance and Record Keeping.

EDEN alleges that BFS has been conducting industrial activities at the site without adequate BMPs to prevent non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit and thus are always prohibited.

BFS's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific Ongoing BMP Deficiencies*

- Many debris boxes and waste bins onsite are left uncovered during the rainy season, full of wood scraps, sawdust, paper, plastic and other wastes

- Black residue from tire tracks observed on ground surfaces throughout facility

-Tracking of white powdered material observed on ground surfaces

-Sawdust observed on ground surfaces throughout facility

-Numerous oil spills observed on ground surfaces

-Non-Storm Water Discharges observed on ground surfaces in multiple areas

-Drain inlets observed lacking any protection or filters, including in areas where oil leaks and spills occur and in the cutting areas

-Corroded and rusted scrap metals and deteriorated wood scrap are stored directly on pervious ground surfaces

-Discharges from indoor industrial operations and equipment covering rooftops observed discharging to ground surfaces through downspouts which lack filtlers

-Roof surfaces are corroded, rusted and in disrepair

-Concrete pad in SE corner of facility used to store finished product is crumbling along the entire south perimeter

-Massive amounts of broken concrete scrap observed to be stored directly on pervious ground surfaces

-Stained and rusted ground surfaces evidence a history of non-storm water discharges throughout facility

Based on the foregoing, BFS has been in ongoing violation of General Permit Sections I.C, V.A, X.C.1.b, X.H.1 and X.H.2 since October 1, 2020, continuing to the present.

## G.  **Failure to Adequately Implement and Train Pollution Prevention Team**

Permit Section X.D.1 requires Dischargers to establish a Pollution Prevention Team responsible for assisting with Permit compliance. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the

regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out-of-town, business, or other absences).

Permit Section X.H.1.f also requires Dischargers to ensure that all Pollution Prevention Team members implementing Permit compliance activities are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.   Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that BFS has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Permit Sections X.D.1 and X.H.1.f.

BFS may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are BFS Group of California LLC, Builders FirstSource, Inc., Ivan Bilbao/PanOcean Inc., Peter Jackson, Pete Beckman, Steve Herron, Ulises Gomez, Daniel Vigil, and other corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is October 1, 2020, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org


**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.


## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT


CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $68,445 per day where penalties are assessed on or after January 8, 2025.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre- and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

### VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages **BFS' counsel** to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how BFS may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if BFS wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from BFS's counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  **Please be advised that it is EDEN's policy not to discuss or negotiate resolution of these matters with unrepresented parties**.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies

Lee M. Zeldin, Director, U.S. Environmental Protection Agency, zeldin.lee@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eric Oppenheimer, State Water Resources Control Board, eric.oppenheimer@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Storm water Program, storm water@waterboards.ca.gov